Good morning. We have this morning four argued cases and three submitted cases. And before we hear our first argument, I'd like to make a motion and considering that motion, Judge Post will preside. And I'm happy to entertain the motion. We have a tradition here of admitting law clerks to the bar here during argument sessions. And it's my pleasure to move this morning the admission of three of my law clerks. Dennis John Abdelnour, and he's a member of the bar in good standing of the highest court of the state of Illinois. And Melanie L. Bostwick, who's a member of the bar of the Supreme Judicial Court of Massachusetts. And Nathan Charles Brunette, who's a member of the bar of the highest court of Maryland. And over the past year, I've acquired intimate knowledge of their qualifications and I'm very, very satisfied that each of them possesses the necessary qualifications. With Judge Moore's concurrence, it's a pleasure to grant the motion. Please raise your right hand. Do you swear or affirm that you will support yourselves and attorneys and counsels of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. I do. I do. Congratulations and welcome to the bar of the United States Court of Appeals. Welcome to the bar and your obligation is to perform as well in the future as you have this year. All right. So we'll now hear argument in number 2007-5094, CCA Associates versus United States. Mr. Woodrow. May it please the court. This court should find that CCA does not possess a ripe as applied takings claim because CCA did not submit a plan of action to prepay its mortgage. And having failed to apply, CCA has not demonstrated that applying was futile because CCA concedes in its brief before this court that HUD possessed discretion to approve a plan of action for prepayment. Your problem is this and this is true of both sides. You have the decision, the 2007 decision in Sienega and neither one of you likes aspects of that. But let's assume for the moment that the panel is bound to follow that decision. How is this different in terms of ripeness than the Sienega case? Yes, Your Honor. It is different from Sienega 10, the 2007 Sienega decision in several respects. First, in Sienega 10, the government did not argue that the plaintiff's takings claims were not ripe. And second, the factual situation here is very different. We have a situation where CCA concedes that it could have submitted a plan of action that would have raised rents on current tenants by less than 10%. You didn't argue in Sienega 10 that the claim wasn't ripe? That's not my recollection. We dealt with that in a footnote in the case. Yes, Your Honor. And in that footnote, the government did argue that the owner's failure to apply to either sell their property or to exercise the use agreement option under the statute meant that its claims were not ripe and this court disagreed. So you did argue the ripeness point in Sienega 10? We did, Your Honor. And also in Chancellor as well. Although we pressed it forward in the briefs in Chancellor. But the critical distinction here, Your Honor, is that CCA concedes that it could have submitted a plan of action that would have raised rents on current tenants by less than 10% and would have protected against the involuntary displacement of current tenants. And moreover... Counsel, there's a fact finding by the trial court about exactly what plan they were intending to and would have adopted. And are you asking us to find that fact finding clearly erroneous about the intentions of CCA vis-a-vis the plan they would have adopted? No. And the reason for that is that this court does not need to disturb those factual findings. So instead you're telling us in the trial court that we should consider a hypothetical plan that they could have adopted that would have complied with the three requirements? Yes, Your Honor, because CCA concedes... And if there's any hypothetical plan they could have adopted that would comply with these requirements, then there's no ripeness? That's correct. And that's consistent... Then why in the world do we have this statute laying out that you can apply and acquire approval if these three requirements are met, if in every single case we're supposed to assume? Because I can't imagine any case where we couldn't construct a plan hypothetically that would comply with these. Well, Your Honor, the answer to that is that it depends on the facts of each particular case and the application... Since it depends on the facts of each case, then wouldn't the relevant fact be what was the plan that the actual company at issue was intending to adopt and compare that to see if it would satisfy these requirements? No, Your Honor, because the facts that are relevant go to whether each of the individual criteria could be met. And in this case, CCA concedes that it could have submitted a plan of action that would have met the first two criteria. And the facts of this case, unlike the facts of Seneca 8, are that prepayment of Chateau-Cleary would have had no effect on the supply of affordable housing. And that particular criteria is different from here in this case and in Seneca 8. So in every single case that a plan could be constructed by the housing plaintiffs that would comply with these three? No, Your Honor. And in effect then eviscerate the notion of the futility exemption? The answer to your first question is no, and because it's no, it would not affect the futility argument. And the reason for that is that the third criteria, which deals with the supply of affordable housing, there are many situations where... Are you talking about your involuntary displacement language? Are you talking about the involuntary displacement language? No, Your Honor, I'm talking about... I thought that was the third criteria. I thought the first was the monthly rental can't exceed 30% and the second was the 10% per year cap, and I thought the third was involuntary displacement. Your Honor, I'm rating the third to be the supply of vacant comparable housing for low-income and very low-income tenants. So the first would be the limits on the amount that rents can increase to either 10% above current rents or such that no tenant pays more than 30% of their adjusted income. Well, let's put it this way. I'm sorry? Let's put it this way. Suppose that they said the only plan we want is one that will completely free us of any restrictions on our prepayment. We don't want to limit the rents to existing tenants. We want to be able to raise those the day after prepayment to market rates. If they had proposed a plan such as that, would that plan have been approved or had any chance of being approved? No, Your Honor, but that does not demonstrate futility. In other words, the futility requirement is set forth in the Supreme Court's jurisprudence in McDonald, in Sweetum, in Palazzolo, is that futility cannot be established if the agency could have approved a less ambitious plan than that sought by the claimant. But it seems to me that in that respect, you're arguing that our Cienega decision was wrong in finding that the claim was right because you're saying that under these Supreme Court decisions, you had to submit a plan that settled for less than you wanted. You had to try to get a less, as you put it, grandiose plan approved in order to have the thing right. No, Your Honor, and the critical distinction again is the fact that if a plan would affect the supply of affordable housing for low and very low income tenants adversely or materially affect it, then it cannot be approved and HUD would not possess the discretion to approve it. What you're saying is they should have negotiated with HUD to come up with a plan in which they were allowed to prepay but agreed to restrict the rents on existing tenants to satisfy this 30-10 requirement, right? Yes, Your Honor. So the question is do they have to apply for a prepayment right that includes restrictions that they don't want to have on it, right? Well, the restrictions would be limited in duration. It's important to understand that the restriction would apply only to current tenants. And once those tenants moved out, the owner would be free to rent those units to market rate customers and to raise rents as much as they could afford to do so. The market would allow it to do so. And so the restriction would be in place only for current tenants. And the interesting thing there is that... That's not what they want, right? That's true, Your Honor, but in order to demonstrate futility, they have to demonstrate that no plan could have been approved. Well, that's the problem, and that position is what we rejected in Sienega. Well, in Sienega, the facts were different because prepayment would have affected, and the government conceded this, the supply of affordable housing for low and very low income tenants. Here, the tenants at Chateau Cleary, by the point of submission, are moderate income tenants. And therefore, prepayment would have no effect on the supply of affordable housing for low and very low income tenants. And so that prong or that criteria of the statute is not implicated in this particular case. And so the only question is whether they could have submitted a plan of action that would have raised rents on current tenants within the statutory limits. And CCA concedes that it could have done so. And because it could have, under the Supreme Court's jurisprudence regarding rightness in Palo Solo, in Sweetum, and in McDonald, Summer, Yates, Violo County, this court should find that CCA cannot demonstrate that it was futile to apply to prepay because a plan could have approved a plan of action for prepayment in this case. And absent either an application to prepay or futility, there is no certainty about how HUD would have applied the statute to this plaintiff. It's also true that under Riverside Bayview Homes that the application of a permitting requirement, such as the statutory criteria that exist here in LIPRA and OLIPA, is not in itself tantamount to a taking. And it's also important for the court to understand that the market rent levels and the levels of the restrictive rents that CCA was charging at the time of prepayment eligibility have no real bearing on this court's analysis of the rightness question because CCA does concede that it could have submitted a plan that would have been approved. What about the merits? Suppose we reject your rightness argument. What about the merits? Your Honor, if this court were to find that CCA did not possess a right-taking claim, it should remand the case for application of the Penn Central factors to the existing factual record of the trial. There would be no need for additional factual finding or evidence. The court should direct the trial court to remand the case and apply the Penn Central factors consistent with this court's decision in Sienega 10, the 2007 Sienega decision. The record here demonstrates that CCA did not suffer economic impact, a significant economic impact, for two reasons. First, CCA had the opportunity under the statutes to sell its property to a purchaser at a price that reflected the highest and best use of that property. In other words, a market price for the property. And doing so might very well have completely eliminated or significantly reduced any potential economic impact suffered by the owner. And second, the government's evidence at trial demonstrated that the diminishing value of CCA resulting from the temporary restriction on its prepayment right resulted only in a diminishing value of approximately 18%. And that diminishing value is not significant enough under the case law to constitute... I don't understand. You want us to decide that there was no taking here, whereas in Sienega we remanded for a decision on the takings issue with the correct criteria. You want us to go further than we did in Sienega? Not necessarily, Your Honor. The record exists for this court to make a decision based on the existing trial record, but prudence would dictate that the court remand the case for a reapplication by the trial court of the Penn Central factors consistent with this court's decision in Sienega 10. As the court knows, the trial court did not have the guidance of this court's Sienega 10 decision when it rendered its opinion. And so prudence would dictate that the court remanded for a reapplication of the Penn Central factors consistent with Sienega 10. Okay. Well, you've used that part of your rebuttal time. We'll give you three minutes for rebuttal. Thank you, Your Honor. May it please the court. Thank you, Your Honor. May it please the court. With the court's permission, I would like to address the investment-backed expectations issue and the economic impact issue. Well, let's just back up for a moment. Assuming that we follow Sienega 10 here, that we're bound by it, how is this case different from Sienega 10 on the Penn Central analysis? Well, first, with respect to investment-backed expectations, we think the findings in the record are adequate to satisfy either the but-for test or the primary expectation test, the two alternatives that were laid down by this court. What the problem is, is that Sienega 10 said that the investment-backed expectations, that you need to look at the actual restrictions that were imposed rather than assuming that there is an absolute right to prepay and to consider the expectations from that point of view, that you have to look at the expectations from the point of view of the actual temporary limited restrictions that were imposed. This case is no different in that respect, right? Well, Your Honor, the trial judge made very precise findings that satisfy either the but-for. But not on that issue. He made findings about an absolute right to prepay. He didn't make findings about restrictions, anticipation about restrictions on the right to prepay that were of limited duration. I think he did, Your Honor. Where did he do that? Well, he found specifically that the prepayment right was the sine qua non of this transaction. Those are his words. And there was a further finding that the prepayment right was the central feature of the transaction. That would satisfy either the but-for. Yeah, but you're talking about a different issue. In Sienega 10, we said the issue is not whether there's an unrestricted right to prepayment. The issue is whether they should have anticipated that the prepayment right be restricted for a limited period in a limited way. Isn't that not what we said in Sienega 10? I understood that this court reaffirmed the position set forth in Sienega 8 with respect to the character of the taking, and that there clearly had been action taken by the Congress which deprived the owners of the right to prepay. Well, put it this way. Do you agree that the Court of Federal Claims here did not make findings on the but-for or primary test with respect to a limited restriction on the prepayment right? The judge made findings based on the record that was before him, and that included the temporary. So my question, did he make findings about the expectations with respect to the limited duration restrictions on the prepayment right? The court made findings that the property owners fully anticipated and expected to have a right to prepay in conformity with the mortgage documents and other transaction documents that were signed in this case, and that was without regard to whether there was a restriction for five years or indefinitely. I think the findings in the trial court made are, I think, more than adequate to satisfy the but-for or primary expectations alternatives. And those are not the only findings that he made. There's a whole host of subsidiary findings that buttress and support these basic conclusions that the judge drew, that the right to prepay was the sine qua non of the transaction and the right to prepay was the central feature of the transaction. But his whole assumption was that the government had taken away entirely the right to prepay, right? Well, at the time that the legislation was passed, the liberal legislation was passed, that's exactly what the government had done. But that's what we rejected in Siena-Gatan. We said it didn't completely take away the right to prepay. It limited it in some way. Well, it did that by the subsequent adoption of the HOPE legislation. No, no, no. Originally, before HOPE was passed. Well, I must not be following the thrust of where you're going, Your Honor, because In Siena-Gatan, we analyzed the legislation at length. And we said this doesn't take away entirely the right to prepay. It limits it in certain respects. It limits it. Do you understand what I'm saying? Well, if you're suggesting And what the Court of Federal Claims did here was it addressed the question as though the legislation, the pre-HOPE legislation, had completely taken away any right to prepay, correct? Well, it in effect did that unless a party went through No, no, no, no. That's not the question. The question is did he assume that the earlier legislation had completely taken away the right to prepay? He assumed that the LIPRA legislation abrogated the right to prepay, but he also dealt with  Entirely. Ending up with a prepayment right through the mechanism of the plan of action for incentives or a request for permission to sell the property in the event that those But he said that's not relevant to the takings analysis, right? He said that that does not go into the economic impact aspect of the analysis. That's true, Your Honor. And that is perfectly consistent with this court's decision in the Whitney Benefits case. No, but it's not consistent with Siena-Gatan, right? Well, but Whitney Benefits, Your Honor, is No, but that's not my question. I'm asking about Siena-Gatan. Well, I understand, but if I may No, I want you to answer my question as to whether that's consistent with Siena-Gatan. Well, our case is different from Siena-Gatan in that respect as a result of the decision in the Whitney Benefits case because No, you're not answering my question. I'm asking about is that consistent with Siena-Gatan. The judge assumed that This decision here is pretty much the same as the decision from the same judge that we reviewed in Siena-Gatan, correct? I think there are very significant differences, not only on the investment expectation side, but also on the economic impact side. There's no doubt that Judge Leto said that you don't factor in the question of the possibility of these options to prepay through the mechanism of a sale or through a plan of action. He said that that does not factor into the economic impact. I acknowledge that. In that respect, he made the same mistake here that he made in Siena-Gatan, right? Is that correct? We did the same thing, Your Honor, but in our case, I don't think it's a mistake because our situation is different as a result of the Whitney Benefits case. In the Whitney Benefits case, the government argued that a coal exchange program had to be taken into account as an economic offset of some sort to the economic impact analysis. And the court specifically put the burden on the government to come forward with evidence to show the value of that economic offset. In this case, there is evidence in the record, and it is, I think, indisputable that the government failed to put in any evidence to show what the value of these offsetting options might be. And indeed, it's even worse than that for the government because their own expert testified that he could not put a value on the potential opportunity to prepay through the mechanism of a sale to a nonprofit or the potential opportunity to prepay if a plan of action for incentives failed. He specifically testified that he could not value those options. He could not put any non-speculative value on those options. And as a result, the record, I think, is such that the effect of or the existence of these two courses of action that the statute presented simply cannot be factored into any type of economic impact analysis. They want us to ignore the offsetting benefits in this case. For the specific reasons of the specific testimony in this case, yes, the testimony is clear from the government's own expert that they cannot be valued in this case. Did you present testimony as to the value of the offsetting benefits? We did not present testimony as to the value of the offsetting benefits because the value of the offsetting benefits is entirely speculative. An economist attempting to value those offsetting benefits in May of 1991 and looking at what the statutory scheme is and the necessity to go through a two- to three-year process with HUD and then be dependent on congressional funding, which we all know dried up at a certain point. So you're saying that what we ordered the court to do in Siena-Katen was impossible? That is certainly the position of the government's own expert as he testified in this case. And it's perfectly understandable that if the court did not have before it the benefit of the type of testimony that Dr. Dickey presented here, where he specifically said that it was pure speculation to try to put a value on the existence of the benefits. And didn't we say that the burden is on you with respect to the economic impact prong, just as it is on the other prongs? Well, if anything, Your Honor, it was approved at trial as a result of the testimony of the government's expert that those benefits, those theoretical benefits, could not be valued, that they could not have a number affixed to them such that you could take them into account in an economic impact analysis. Counsel, do you mind if I move you on to the return on equity versus change in value approach? Because we're running low on time. I'd be delighted. Okay. I understand and appreciate your argument about stare decisis. And your argument, as I understand it, is that Siena-Katen already said the return on equity approach was acceptable. And let's put that argument aside for a minute. Let's assume that we're bound by Siena-Katen or that we believe ourselves to be bound by Siena-Katen. You realize, unfortunately for you, it is a seven-judge panel there, which is practically in bank. And just assume we put that argument aside for whatever reason. And how, then, do you get around the Siena-Katen comments and language, which is not dicta, that says that change in value is the only mechanism which evaluates the parcel as a whole from the Supreme Court precedent? How do you suggest to me that the return on equity approach that was adopted in this case is acceptable and that we could affirm it? Well, my first argument would be based on the Supreme Court's decision in Hodel versus Irving, which was not before the court in Siena-Katen. That argument was not made to the court in Siena-Katen. It's a physical takings case, right? Pardon me? It's a physical takings case, isn't it, Hodel? Hodel is a regulatory takings case in which the court applied the Penn Central analysis and determined that in that instance there was a fundamental right that had been taken, the right to devise, and that notwithstanding the absence of any investment expectations and in the light of really the most minuscule economic impact, nonetheless there was a regulatory taking applying the Penn Central test. So we think that that case is controlling here because we have the same type of fund—we actually have a stronger case, an A4 Shuri case. We have in this case the same type of fundamental right, the right to exclude, that has been recognized by the Supreme Court in Lingle versus Chevron and the Kaiser Aetna case to be a fundamental right. Indeed, the court has described it as perhaps the most fundamental of all property rights. So we have then this fundamental right to exclude. Sienega 8 held in an aspect of the decision that was not disturbed by Sienega 10. This sounds very much as though you're asking us to reject Sienega 10. I'm not asking the court to reject Sienega 10. I'm asking the court to affirm on the basis of an argument that was not presented to this court in Sienega 10, and the court did not have the benefit of briefing on the point, and to consider the applicability of— You're saying we shouldn't follow Sienega 10 because in your view it's inconsistent with HODL. I'm saying that HODL applies to our case here. The court in Sienega 10 did not have the benefit of briefing on that. That was simply not before the court, and I think this panel is certainly free to take up the HODL of the Irving argument. Suppose we reject that. Pardon me? Suppose we reject that. Where are we? If the court rejects that argument, and I hope the court will not because, as I say, we have an a fortiori case. We have not only the fundamental right to exclude, which has been taken, but we have clear investment-backed expectations, and we have definite economic impact. Even the government admits it. Suppose we— If you reject it, then our second reason why you should affirm is based on the discussion that we just had with Judge Moore. We think that Sienega 8, as the first filed case under this court's ruling in Newell, is required to be followed by this panel. There's no question that— But suppose we reject that. Suppose we say we're obligated to follow Sienega 10. Sienega 10 isn't undermined by HODL. Suppose we say we have to follow Sienega 10. Don't we have to remand here? I think there's still a third point that I would make after my HODL point and my Newell point, and the third point is that Penn Central's requirement that the courts in these takings cases apply an ad hoc, very fact-intensive analysis directed at achieving fundamental fairness would require affirmance as well. And that's because—and this is to some extent a problem that arises from Sienega 10. In Sienega 10, we submit that the court conflated Penn Central regulatory takings of income-producing properties with categorical takings of the type that we saw in the Lucas case, for example, and simply imported the temporal dimension of the parcel-as-a-whole concept into this type of regulatory context. And in the categorical takings case, where the inquiry is to determine whether or not all of the economic value has been taken, the parcel-as-a-whole concept makes perfect sense because there you want to make sure that short-term moratoria, nuisance abatements, permitting delays don't result in a claim for compensation. Penn Central, in the regulatory context of Penn Central, particularly when we're dealing with an income-producing property of the type that we have here, similarly protects the government's interest that the parcel-as-a-whole concept is designed to protect in the categorical takings context. I think you should probably sum up here because we're out of time. Well, can I ask one quick question before you sum up? I appreciate what you just articulated, and it's very logical, the distinction that you draw between temporary takings and the physical appropriation and or categorical takings of Lucas with regard to economic impact and the parcel-as-a-whole language in particular. It seems to me also, and I'd like you just to explain this for a second, that it might be supported by the notion that in compensation or the assessment of compensation, the Supreme Court has always looked to lost rents as the form of impact on parties in temporary takings cases. It seems to me that further supports what you're saying because what is economic impact, but how much should we compensate you? This is the method they use for analyzing compensation. It seems to me it would further support your argument. I think that's right, Your Honor. Indeed, the World War II takings cases, Pee Wee Cole, I think are directly supported. Even if I agree with you on all of this, which I may very well, I still got to look at Siena-Gaten, and what do I do? I think Siena-Gaten, and I say this respectfully, we submit is inconsistent with Tahoe-Sierra at the end of the day. We have to take it in bank, though. This panel, panel of three, certainly can't overrule it on that basis. If you don't like my Hodel argument and if you don't like my Newell argument, and we come to this point here that Tahoe-Sierra, which rejected a categorical taking on the basis of the parcel as a whole, but nonetheless the court said in that case, in the case of a 32-month moratorium, that if the plaintiffs had pressed their case using a Penn Central analysis, they very well may have prevailed. Well, if you applied Siena-Gaten to that Tahoe-Sierra context, there's no way. The property owners could have prevailed. And we submit, therefore, there is a basic- But we can only do that in bank. That's the problem. That you could do- And you realize the original decision in Siena-Gaten had seven judges on it, six of which joined the majority. There were only 12 of us in bank. I understand that the challenge is before me. This isn't really just uphill. This is straight vertical for you. Well, that's why I guess I would really urge the court to look at the Hodel argument. I don't think the court is precluded from doing that. I don't think adopting Hodel and applying it to this plaintiff, this property owner, is in any way inconsistent with Siena-Gaten. It's just different. You didn't have a Hodel before the court in the Siena-Gaten case. And I think the path is certainly open for an affirmance in that regard. I mean, we have a very different- Any further questions? Thank you, Mr. Palma. Thank you, Your Honor. Your Honor, with respect to the ripeness question, the government in Siena-Gaten conceded that applying to prepay pursuant to Section 4108 of LIPRA would have been futile. And therefore, the question that's before this court, whether applying pursuant to 4108, was not presented to the court in Siena-Gaten. Second, here, CCA could have submitted a plan of action that contained all of the features that it wanted to have. And HUD very likely might have denied that plan of action. Did you really go over the futility during his? I mean, yours is really a rebuttal, right? I'm sorry? I don't remember spending much time on futility with regard to the appellee. It seems the rebuttal time would probably be best served focusing on rebutting what we discussed with him. Certainly, Your Honor. With respect to investment-backed expectations, it is true that the trial court, in this case, made no findings regarding the reasonable expectations of investors engaged in these programs. And it made no findings with respect to whether those expectations might be the primary or but-for reason for investing. But didn't the trial court say it was the only reason, really, that this contract was entered into? And wouldn't that necessarily, as a fact-finding, satisfy either test, regardless of which one this court chose to adopt? No, because the test, as this court explained in seeing it again, Tim, looks first at the objective expectations of reasonable developers, not the subjective expectation of this particular investor. It looked first at the general expectations, reasonable expectations of objective developers, and then having concluded that the prepayment right was either a primary or but-for reason for investing, it then would look at the subjective expectations of the particular developer. Here, the court turned that test on its head. It looked instead first and only at the subjective expectations. But it would be the objective investor in this situation, correct, not just any objective investor in a different set of facts. And in this particular situation, hadn't the tax benefits and other financial incentives been completely exhausted? So anyone, since that's the case, would have been focusing on the prepayment as the only significant benefit to arrive from this contract. No, Your Honor, because the test is applied at the time of initial investment, and the government's tax expert and a 1972 treatise that we discussed at trial all demonstrated that at the time of the initial investment, the primary reason for getting into these HUD investments were the tax savings. They were highly leveraged investments with very little risk, and they presented incredible tax savings, tax savings which this particular investor did use to its advantage. Your Honor, with respect to the sale option, the government did show the value of the sale option. It presented testimony of an appraiser that looked at the value of the property as a market rate property. That value would have been the price the property would have commanded on the open market had it been sold pursuant to the statute. So it is true that the government presented evidence of the value of the sale option. Finally, with respect to the Hodel case, the preservation statutes in this case did not affect the right of the owner to exclude tenants. The owner had the option to choose what tenants would reside in its building, and it was free to reject tenants. And further, the Hodel case dealt with a categorical taking that the statute in that case categorically eliminated a certain type of right of inheritance, which is not at all the situation here. The situation here is that the statutes restricted but did not eliminate the right of prepayment. Thank you very much, and for these reasons, we ask that the Court remand the case.